```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


EAGLE LAKE ESTATES, L.L.C.,
RAY ROBERT GREZAFFI and                      CIVIL ACTION
DEBRA ANN GREZAFFI TILLERY

VERSUS                                       NO: 04-0169


CABOT OIL & GAS CORPORATION                  SECTION: "J"(1)
```

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for trial before the Court, sitting without a jury, on March 23, 27, and 28, 2006. Having considered the testimony at trial, the documentary evidence, the memoranda of counsel, and applicable law, the Court now stands ready to rule, and in accordance with Federal Rule of Civil Procedure 52(a), issues the following Findings of Fact and Conclusions of Law. To the extent the findings of fact are more properly classified as conclusions of law, they should be so considered; to the extent the conclusions of law are more properly classified as findings of fact, they should be so considered.

# FINDINGS OF FACT

## A. Jurisdiction

Plaintiffs are residents of, domiciled in, and/or organized with their principal places of business in the State of Louisiana. Defendant, Cabot, is organized under the laws of the State of Delaware with its principal place of business in the State of Texas. The amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

## B. The Leases

Defendant operates the Cabot Oil & Gas Corporation-Ellender ENT. No. 1 Well (hereinafter "Subject Well"). Ellender Enterprises, L.L.C. owns the property on which the Subject Well is located. The property is located in a prospective oil and gas production area that Cabot had labeled the Hayworth Prospect.

Louisiana Oil and Gas, Inc. negotiated mineral leases in its own name on Cabot's behalf in the earlier part of the relevant time period. SunCoast Land Services, Inc. negotiated mineral leases in its own name on Cabot's behalf in the latter part of the relevant time period. Russell Thomas is the co-owner of both

of these businesses.

Cabot began acquiring oil, gas, and mineral leases in the Hayworth Prospect in January of 2002 through Louisiana Oil and Gas, Inc. On August 1, 2002, Ellender Enterprises L.L.C. ("Ellender Enterprises") entered into an oil, gas, and mineral lease with Cabot, as lessee, (the "Ellender Lease"). This lease was taken pursuant to a pre-existing option to lease granted by Ellender Enterprises to Richard Miller. Mr. Miller required Cabot to grant a two percent (2%) overriding royalty in the Ellender Lease to him as consideration for his rights in the option, and the Ellender Lease itself had a twenty-five percent (25%) lessor's royalty, making the combined royalty burden on the Ellender tract twenty-seven percent (27%).

Plaintiffs own separate pieces of property directly adjacent to and in the vicinity of the Ellender tract. Plaintiffs granted Louisiana Oil & Gas, Inc. two separate mineral leases covering portions of these properties directly adjacent to and in the vicinity of the Ellender lease on January 4, 2002. Luke Grezaffi negotiated leases on behalf of all of the Plaintiffs.  The Plaintiffs' leases were assigned to Cabot by Louisiana Oil & Gas, Inc. on August 19, 2002. Plaintiffs became the lessors of Cabot on that date.

By September of 2002 Cabot had successfully leased nearly the entire 950 acre area that made up the Hayworth Prospect.

Sometime after May 18, 2003, Russell Thomas was advised by a title attorney of a potential title problem with an approximately eight acre portion of a roadbed ostensibly covered by plaintiff Eagle Lake Estates' lease, in that it might actually be owned by plaintiffs Luke Grezaffi and Mary Belle Roberts Grezaffi individually, rather than by Eagle Lake Estates. A decision was made to attempt to take a curative lease from Luke Grezaffi and Mary Belle Roberts Grezaffi as the competing title holders.

Mary Cay Guidry, the same landperson used to acquire the Eagle Lake Estates lease and the 2002 Grezaffi Lease, approached Mr. Grezaffi about leasing his and his wife's interest. At that time most of Mr. Thomas's business was being conducted through SunCoast, so Mary Cay Guidry was asked to acquire this lease in the SunCoast name, rather than the Louisiana Oil and Gas name. Luke Grezaffi and Mary Belle Roberts Grezaffi granted an oil, gas and mineral lease to SunCoast on May 23, 2003. On that same day, Ray Robert Grezaffi, Debra Ann Grezaffi Tillery and James C. Harper granted an oil, gas and mineral lease covering approximately two and one-fourth acres adjacent to the Ellender Lease to SunCoast.  This lease was again negotiated by Mary Cay

Guidry on behalf of SunCoast and Cabot and by Luke Grezaffi on behalf of the Grezaffi Lessors.

Cabot is the mineral lessee of numerous other property owners in Hayworth Prospect and in the vicinity of the Ellender lease who are not parties to this lawsuit. The royalty burdens of these leases are less than the burden on the Ellender tract. Due to the 27% royalty burden on the Ellender tract, it would have been more profitable for Cabot to produce the Subject Well on a unit basis even without the May 23, 2003 leases obtained from Plaintiffs. Cabot's financial interest in an expedited unitization process was in line with Plaintiffs' financial interests, such that there was no financial motivation for Cabot to delay unitization. Cabot did not delay unitization to obtain the May 23, 2003 leases from Plaintiffs.

### C. The Unitization Process

Units can be based on geological boundaries or geographical boundaries. A geological unit is preferred if sufficient data are available. Cabot's understanding of the geology under the potential unit at issue in this case was complicated by the fact that there was a lack of precise seismic data and few existing

data points nearby to assist in accurately predicting the characteristics of the reservoir. The northern back-up fault of the reservoir was uncertainly defined, the reservoir was not pressured as expected, the field and sand in which the well was located were initially misidentified, and the reservoir dipped in a different direction than expected.

The uncertainty of the geological data eventually resulted in a decision in early March 2003 to form a geographical unit. The size of the potential reservoir is important even if the unit is ultimately geographical rather than geological because of the need to prevent drainage by offset wells located outside the boundaries of the unit that have access to the reservoir. Protecting against extra-unitary drainage is in the interests of the lessee/operator, the lessors, and the unleased properties within the unit.

On or about November 24, 2002, Cabot spudded the Subject Well on the Ellender Lease. The Subject well was permitted as a "wild cat" well, meaning that the oilfield in which that well might be located was unknown. The Subject Well was initially drilled as a straight hole, but because the well encountered a limited pay sand, a decision was later made to side track the well to search for a better position in the reservoir.

Cabot commenced sidetrack drilling in the Subject Well on or about December 24, 2002, and on January 7, 2003, the sidetracking of the Subject Well was ceased in what was believed to be a more productive portion of the sand.  The bottom hole location of the sidetrack was still on the Ellender Lease. On January 7, 2003, Cabot obtained electric well logs for the sidetrack of the Subject Well that showed that it had encountered approximately fifty-seven feet of pay sand. This was a promising reading. However, the log of the closest well, immediately to the west of the Subject Well, had also appeared promising, and that well's production depleted on test for unknown reasons. There was some legitimate concern that the same would happen with the Subject Well.

As Plaintiffs' and Cabot's experts agreed, upon obtaining the well log for the Subject Well on January 7, 2003, Cabot could have hired a petroleum geologist to assist in an analysis of the geology and to begin unitizing the Subject Well, without waiting for regenerated seismic data or production data. However, the Court gives credence to Cabot's experts, particularly Frank W. Harrison, Jr., that taking such action at that time was not the most prudent course. In addition, had the boundaries of the unit been developed with the data existing on January 7, 2003, the

result would have been less favorable to Plaintiffs than the unit ultimately proposed.

Following the log of the Subject Well, Cabot decided to regenerate the seismic data and re-map the geology with the more accurate data. Cabot also decided to seek production data, and so installed the casing for the Subject Well on January 22, 2003. Cabot ran limited production tests, called flare tests, on the Subject Well on January 28 and 29, 2003, obtained the results on February 4 and 14, 2003, and thereafter reviewed the data. The flare tests were too brief to be of much value in estimating the size of the reservoir. Cabot was justified in seeking more production data and updated seismic data before attempting to develop the boundaries of the unit.

On or about February 27, 2003, Cabot asked Russell Thomas to begin preparing an Interested Parties List, or IP List, in preparation for unitization of the Subject Well. An IP List is a list of individuals who own mineral interests in the area within a proposed production unit and in the area "proximate to" the proposed unit. The IP list is used to notify the individuals of the fact that a well near their property is going to be unitized.

On March 16, 2003, Defendant began production of the Subject Well. Cabot's in-house geologists and engineers used the additional production information obtained from the first two

weeks of production to better estimate the productive limits of the reservoir and develop a picture of what geographical area a proposed unit should cover. In light of the particular geological uncertainties and the unfavorable well-test nearby, seeking this information prior to developing proposed unit boundaries did not breach the duties of a prudent operator.

The only evidence Plaintiffs provide that substantial drainage occurred prior to unitization is the fact that portions of Plaintiffs' tracts were eventually included in the unit.

On or about April 2, 2003, Cabot contacted William H. Robbins, a consulting petroleum geologist to retain him to assist in an analysis of the geology and to assist in unitizing the Subject Well. The steps taken toward unitization by Cabot and its agents following the April 2, 2003 retention of Mr. Robbins were expeditious and reasonable, as admitted by Plaintiffs' own expert, W. Clay Kimbrell. On or about April 8, 2003, Mr. Robbins, on behalf of Cabot, contacted B. J. Duplantis to request that he act as Cabot's unitization attorney.

On April 15, 2003, the Louisiana Office of Conservation designated the Subject Well to be in the Willow Woods Field, effective March 16, 2003.

The IP List was forwarded to Mr. Duplantis's assistant,

Helen Trew, in late May or early June of 2003. On or about June 9, 2003, Mr. Duplantis formally instituted unitization of the Subject Well on behalf of Cabot by sending the Pre-Application Notice to the Interested Parties in the Willow Woods Field, Terrebonne Parish, Louisiana. Mr. Duplantis did not delay the date of the Pre-Application Notice to wait for the completion of the IP List; when he was ready to send notice, the IP List was already prepared. Therefore, the date on which Cabot began preparing the IP List is irrelevant.

The Pre-Application Notice fixed a pre-application conference in Lafayette, Louisiana for June 30, 2003. The pre-application conference was held in Lafayette, Louisiana on June 30, 2003 and certain Interested Parties and/or their representatives attended. Luke Grezaffi attended.  Plaintiffs were represented by their outside consultant, Mr. Louis Gilbert, during the Pre-application Conference. Two alternatives to Cabot's proposed unit were presented by other landowners, both of which would have eliminated a large portion of Plaintiffs' acreage from the unit.  Even Mr. Gilbert's preliminary mapping was not as favorable to Plaintiffs as that proposed by Cabot. Consequently, Plaintiffs supported Cabot's proposal at the Pre-Application Conference and during the rest of the unitization

procedure. Cabot's proposal would have been less favorable for Plaintiffs had Cabot proceeded in the manner Plaintiffs' argue it was obligated to do to protect Plaintiffs' interests.

On July 7, 2003, Cabot formally applied for unitization of the Subject Well. The unitization hearing was set by the Louisiana Office of Conservation for August 26, 2003, and on that date the unitization hearing was held before the Commissioner and his staff in Baton Rouge.  Plaintiffs were represented by Mr. Gilbert during the unitization hearing, and Mr. Gilbert supported Cabot's plan. On September 26, 2003, the Unitization Order was issued by the Commissioner with an effective date of August 26, 2003, creating a unit for the Khrumbaar Sand around the Subject Well.

Cabot did not provide any compensation for Plaintiffs' mineral interests and royalties from March 16, 2003, when production began, to August 26, 2003, the effective date of the unitization order. On October 16, 2003, Plaintiffs wrote and delivered a demand letter to Cabot relating to the 2002 Grezaffi Leases and the Eagle Lake Estates Lease claiming that Cabot breached its implied obligation to protect the Plaintiffs from drainage by failing to timely apply for unitization.

**CONCLUSIONS OF LAW**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the defendant is diverse from all of the plaintiffs and the matter in controversy exceeds $75,000.00. Because jurisdiction is based on diversity, Louisiana law applies to the substantive issues of the case. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

A lessor is not entitled to royalties for minerals extracted from beneath his land prior to unitization. *Pierce v. Goldking Properties, Inc.*, 396 So. 2d 528, 533 (La. App. 3rd Cir. 1981). This is true because under Louisiana's "rule of capture", a landowner does not own the minerals underlying his land but instead has the right to explore for minerals and then becomes the owner thereof only after the minerals have been reduced to possession. La. R.S. §§ 31:5-8; *Higgins Oil & Fuel Co. v. Guaranty Oil Co.*, 82 So. 206 (La. 1919); *Desormeaux v. Inexco Oil Co.*, 298 So. 2d 897 (La. App. 3rd Cir. 1974).

Every mineral lease carries an implied obligation that the mineral lessee will develop the leased premises with reasonable diligence for the mutual benefit of the lessor and the lessee. *Breaux v. Pan Am. Petroleum Corp.*, 163 So. 2d 406 (La. App. 3rd

Cir. 1964). A mineral lessee leasing adjacent tracts and producing from a well on one tract that drains an adjacent tract has a duty to take such steps as a prudent administrator would take under the prevailing circumstances to protect the adjacent owner from substantial drainage. *Williams*, 432 F.2d at 172; *Breaux*, 163 So. 2d at 409. The adjacent property owner may sue the mineral lessee for damages for breaching this duty by failing to timely seek unitization. *Williams*, 432 F.2d at 173.

   The burden is on the landowner plaintiff to prove the elements of an action for drainage. *Williams v. Humble Oil & Refining Co.*, 432 F.2d 165, 170 (5th Cir. 1970); *Breaux v. Pan Am. Petroleum Corp.*, 163 So. 2d 406, 415 (La. App. 3rd Cir. 1964). The plaintiff must show that substantial drainage has occurred, and that the lessee could have created a pooling unit, but failed to do so. *Williams*, 432 F.2d at 173. The lessee may defend a suit based upon failure to unitize by showing that a prudent operator would not have formed a unit at that time. *Williams*, 432 F.2d at 174. What action a prudent administrator would take and whether a lessee has breached his duty under the circumstances is a factual question to be decided by the trier of fact in light of the relevant evidence. *Id*. at 171-73.

   Cabot owed competing duties to all of its lessors to act as

13

a prudent administrator. These included the duty to the Ellender site lessor to diligently develop the well, the duty to Plaintiffs to prevent substantial drainage, and the duty to the other lessors who are not parties to this lawsuit to reasonably assess how the unit should be configured to avoid extra-unitary drainage. The duty to Plaintiffs was not to prevent substantial drainage at all hazards and all costs, *Williams v. Humble Oil & Refining Co.*, 290 F.Supp. 408, 415 (E.D.La. 1968), or to unitize as soon as possible, as Plaintiffs claim. Cabot had a duty to take such steps as were prudent under the circumstances. *Id.* at 422; *Williams*, 432 F.2d at 172.

The production data that Cabot obtained in the two weeks following March 16, 2003, is, by regulation, considered "pertinent data" in any unit proceeding, LA. ADMIN. CODE tit. 43 § 3903, which supports Cabot's decision to acquire such data prior to unitization. The law contemplates that particular circumstances, as those presented here, may dictate that prudent operation of leased tracts will result in noncompensable pre-unitization drainage. *See Pierce v. Goldking Properties,* 396 So. 2d 528, 534 (La. App. 3d Cir. 1981).

**CONCLUSION**

Although the unitization process could conceivably have been initiated sooner, Cabot was not imprudent for proceeding as it did. Therefore, Cabot did not breach its implied duty to Plaintiffs, and is not liable for damages resulting from any drainage that may have occurred before unitization.

New Orleans, Louisiana this the 12th day of May, 2006.

*[signature]*

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE